OPINION
Plaintiff-appellant Nancy Huberty, Executrix for the Estate of Edward D. Huberty, appeals the October 29, 1999 Judgment Entry of the Stark County Court of Common Pleas which granted summary judgment against her. Defendants-appellees are Esber Beverage Company, and Gary Esber.
STATEMENT OF THE FACTS, Appellant's decedent, Edward Huberty, worked as a driver/salesman for Esber Beverage Company from March 28, 1977, until his death on December 14, 1996. This position required Mr. Huberty to deliver cases of wine and kegs of beer to various taverns, restaurants and carry-out stores on an assigned route. He was responsible for lifting kegs and cases from the truck and transporting them into the storeroom of a customer's facility. The position required frequent and repetitive heavy lifting. Mr. Huberty was actively involved in his local union, Teamsters Local 92. This association was a source of great support to Mr. Huberty, although the affiliation was also a source of significant tension between Mr. Huberty and appellees. In fact, Esber Beverage Company fired Mr. Huberty when he first joined the union in 1978. However, the company was forced to reinstate Mr. Huberty after he successfully pursued a grievance through the union. Mr. Huberty maintained Gary Esber did not like him or his affiliation with the union, and as a consequence, Mr. Esber constantly belittled, harassed and insulted Mr. Huberty throughout his employment. By 1993, Mr. Huberty had developed rotator cuff tendonitis in both shoulders caused by constant, repetitive heavy lifting. Dr. Anthony Pentz, M.D., Mr. Huberty's treating physician, advised Mr. Huberty surgery was required to correct the injuries. Mr. Huberty filed a workers compensation claim. Esber Beverage Company contested the worker's compensation claim and Mr. Huberty continued to work until the worker's compensation matter was resolved. While the claim was initially denied, Mr. Huberty was subsequently granted worker's compensation benefits for this injury. On February 1, 1995, Dr. Anthony Pentz performed the surgery on Mr. Huberty. Unfortunately, by the time of the surgery, the shoulder was irreparably damaged. Dr. Pentz opined the delay in treatment was the cause for the worsened condition of Mr. Huberty's shoulder. Dr. Pentz prescribed permanent work restrictions for Mr. Huberty which limited the weight and the way in which Mr. Huberty was permitted to lift objects. Mr. Huberty's injuries prevented him from performing any job which required heavy lifting or lifting objects repeatedly above the chest and/or shoulder level. Dr. Pentz's' restrictions specifically included no repetitive or stressful activities where Mr. Huberty would be required to lift objects over the ninety degree point, and prohibited any lifting over forty pounds from the floor to the waist level. Because the position of driver/salesman required lifting kegs of beer and other heavy objects on a daily basis, Mr. Huberty was no longer capable of performing his job. In February of 1996, Mr. Huberty participated in the Board of Workers' Compensation's (hereinafter "BWC") program of physical therapy and rehabilitation. Under the BWC program, Mr. Huberty worked with vocational rehabilitation services department specialist, Lisa Berkowitz. Ms. Berkowitz established a vocational goal based upon her evaluation of medical evidence, including Dr. Pentz' restrictions from overhead lifting. Mr. Huberty, with Ms. Berkowitz's help, explained the situation to Esber Beverage and asked to be placed in a different position at Esber Beverage. Specifically, appellant requested the beverage sales representative (hereinafter "BSR") position. This position required little heavy lifting, but was a non-union position. From October 1995, to September 1996, Ms. Berkowitz attempted to re-employ Mr. Huberty in the BSR position at Esber Beverage. In her deposition, Ms. Berkowitz testified appellees refused to cooperate with her effort to return Mr. Huberty to work at Esber Beverage. Ms. Berkowitz noted appellees initially claimed Mr. Huberty was not capable of performing the BSR position. Mr. Huberty was never transferred to the BSR position. He passed away before the situation was resolved. After his passing, his widow, as administratrix of his estate, filed the instant action. While Mr. Huberty was never affirmatively and specifically terminated from his employment, he never returned to work following his injury. STATEMENT OF THE CASE On April 2, 1998, appellant filed a complaint in the Stark County Court of Common Pleas. Appellant filed her first amended complaint on July 6, 1998, and on August 18, 1999, appellant filed a second amended complaint. Plaintiff's second amended complaint asserted the following causes of action: (1) Discrimination on the basis of an alleged disability under the Americans with Disability Act (hereinafter "ADA") and under the Ohio's corollary statute, R.C. 4112.02(A); (2) wrongful discharge in violation of public policy and retaliation for appellant's decedent filing a workers' compensation claim; (3) wrongful discharge in violation of public policy and retaliation for appellant's involvement and potential involvement in union activities; and (4) intentional infliction of emotional distress against Gary Esber individually. Appellee also maintained the complaint contained a claim for wrongful death. We note the claim was not specifically set forth below and no claim or issue surrounding a wrongful death claim is raised on appeal. On October 29, 1999, the trial court granted appellees' motion for summary judgment and dismissed appellant's complaint. It is from this judgment entry appellant prosecutes her appeal assigning the following as error:
 I. THE TRIAL COURT ERRED IN FINDING THAT EDWARD HUBERTY WAS NOT A DISABLED WORKER UNDER THE DEFINITION OF THE AMERICANS WITH DISABILITIES ACT.
 II. THE TRIAL COURT ERRED IN FINDING THAT APPELLANT'S DECEDENT WAS NOT ENTITLED TO A REASONABLE ACCOMMODATION BY HIS EMPLOYER.
 III. THE TRIAL COURT ERRED IN FINDING THAT APPELLANT'S PUBLIC POLICY CLAIMS WERE PREEMPTED BY THE NATIONAL LABOR RELATIONS ACT AND OHIO REVISED CODE § 4123.90.
 IV. THE TRIAL COURT ERRED IN FINDING THAT AS A MATTER OF LAW, APPELLANT HAD NOT SHOWN A CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.
 I
In her first assignment of error, appellant maintains the trial court erred in finding Mr. Huberty was not "disabled" as defined under the ADA. Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35, 36. Civ.R. 56(C) states, in pertinent part: Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor.
Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall (1997), 77 Ohio St.3d 421,429, citing Dresher v. Burt (1996), 75 Ohio St.3d 280. It is based upon this standard we review appellant's assignment of error. ADA As a general rule, the ADA provides: 42 U.S.C.A. § 12112
Discrimination (a) General rule.
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
This general rule contains a number of important concepts, each of which requires an independent analysis. We turn our attention first to the definition of "discriminate,"also contained in42 U.S.C.A. § 12112. It is defined to include:
* * *
 (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an * * * employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
 (B) denying employment opportunities to [an]* * * employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;
Following the statutory scheme to determine whether an employer has discriminated against an employee in violation of the ADA, we must first analyze whether Mr. Huberty was "disabled." If a disability is found, we would then consider whether or not Mr. Huberty was a "qualified individual with a disability."29 C.F.R. 1630.2 defines "disability" as follows:
 (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
* * *
(h) Physical or mental impairment means:
 (1) Any physiological disorder, or condition, * * * affecting one or more of the following body systems: * * * musculoskeletal;
Because Mr. Huberty's injury was a physiological disorder affecting his musculoskeletal system, the first prong of the definition of disability has been met. We now review whether this condition caused a substantial limitation of a major life activity. A major life activity is defined as: (i) * * * functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
29 C.F.R. 1630 (i).
Further elucidation of the concept of the "major life function" is contained in 29 C.F.R. 1630, appendix:
Section 1630.2(i) Major Life Activities
This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation act at 34 C.F.R. part 104. `Major life activities' are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks. Walking seeing, hearing, peaking, breathing learning and working. This list is not exhaustive. For example other major life activities include, but are not limited to sitting, standing lifting, reaching. See Senate Report at 22; House Labor Report at 52; House Judiciary Report at 28.
(Emphasis added).
The Code of Federal Regulations specifically lists lifting and reaching, in addition to the performance of manual tasks and working, as major life activities. Accordingly, we now focus on whether Mr. Huberty was "substantially limited" in the performance of any of these major life activities. The Code of Federal Regulations defines "substantial limitation" as:
* * *
 (I) Unable to perform a major life activity that the average person in the general population can perform; or
 (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
29 C.F.R. 1630(j).
In order to determine whether a substantial limitation exists, the statute provides considerations including:
(i) The nature and severity of the impairment;
(ii) The duration or expected duration of the impairment; and
 (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.
(3) With respect to the major life activity of working —
 (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.
 (ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":
 (A) The geographical area to which the individual has reasonable access;
 (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
 (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).
29 C.F.R. 1630.2(j) (1)-(3).
* * *
In its judgment entry, the trial court found Mr. Huberty was not disabled under the ADA "because a rotator cuff injury is not a physical limitation which substantially limited Mr. Huberty in his major life activities within the meaning of R.C. 4112.02(A)." Judgement Entry at 3. For purposes of this portion of appellant's first assignment of error, we review appellee's motion for summary judgement under the ADA, following the above-cited law in accordance with Ohio's summary judgment standard. In its motion for summary judgment, appellees claimed Mr. Huberty was not disabled under the ADA. Appellees reasoned because Mr. Huberty did not have a "disability," he he could not be a "qualified individual with a disability," and therefore could not have been entitled to "reasonable accommodations." In support of this contention, appellees claimed Mr. Huberty's shoulder injury could not amount to a disability because it did not substantially limit one or more of his major life activities. Appellees point to the deposition testimony of Mr. Huberty's wife, Nancy, at pages 98-100 of her deposition. Plaintiff testified as follows: Q. Okay. Well, in July of 1996 was there anything that Ed was unable to do, aside from whatever the restrictions were placed on him by Dr. Pentz?
 A. The only thing that I knew that he couldn't do, and this is when I observed him trying to change a light bulb at his mother's, when he lifted his arm straight up, and he was on a ladder, in order to keep it that way, he had to hold it like this. (Indicating.)
 Q. He had to hold his right arm up under the elbow by putting his left hand under the elbow?
A. Yes.
 Q. Aside from that, in July of 1996 when Ed was trying to, or according to you, when Ed wanted to go back to work at Esber Beverage, was there anything else that he was unable to do aside from the lifting restrictions that Dr. Pentz had indicated?
A. Not that I observed.
Q. Was Ed able to feed himself?
A. Oh, yes.
Q. Was he able to bathe himself?
A. Yes.
Q. Go to the bathroom by himself?
A. Yes.
Q. Have intercourse?
A. Yes.
Q. Believe it or not, it's a permissible question.
A. Yes.
Q. Was he able to drive himself wherever he wanted to go?
A. Yes.
Q. He was obviously able to climb ladders?
A. Yes.
Q. Was he able to walk?
A. Yes.
Q. Walk up and down stairs?
A. Yes.
Q. Brush his teeth?
A. Yes.
Q. Read, write?
A. Yes.
Q. Use the telephone?
A. Yes.
 Q. All right. So really it was just the lifting that was a problem for him?
 A. I didn't observe him lifting anything else at that time. I know they put him in physical therapy. They made him lift. But what his capabilities at that time, I don't know.
 Q. Okay. And we've talked about Dr. Pentz's letters and his records, and you agree with me Dr. Pentz had placed some limitations on Ed?
A. Yes.
T. of Depo. Of Nancy Huberty, p. 98-100.
We find appellees set forth specific record evidence Mr. Huberty was not disabled, thereby shifting the burden on summary judgment to appellant to set forth record evidence indicting a genuine issue of material fact as to whether or not Mr. Huberty had a substantial limitation on a major life activity. In appellant's response to appellees' motion for summary judgment, appellant focused on the substantial limitation on the major life activities of "performing manual tasks" and/or "working." Specifically, appellant set forth portions of the deposition testimony of Dr. Anthony Pentz, M.D.:
 Q. Doctor, was the surgery successful in Mr. Huberty's case?
 A. I think we improved the patient's situation but we didn't accomplish what we had hoped to. The goal of rotator cuff repair surgery is just that, to draw that rotator cuff tissue that's pulled away and draw it back to the ball of the arm where it naturally belongs. In Mr. Huberty's case we could not mobilize this tissue, we could not gain coverage.* * * the motor is disconnected and the patient will always have permanent weakness * * *
* * *
 Q. Doctor, in your opinion, subsequent to the surgery was Mr. Huberty able to perform his job as a beer truck sales job, salesman with Esber Beverage?
* * *
 A. It was my opinion that Mr. Huberty was not able to deliver beverages as he had done in the past for Esber Beverage.
 Q. And Doctor, would you please describe to the jury with a reasonable degree of medical certainty whether or not Mr. Huberty had limitations on his ability to do manual tasks and/or work?
* * *
 A. Yes. It's my opinion with a reasonable degree of medical certainty that this patient had distinct limitations. We placed him through a full rehabilitative protocol to maximize the function of the muscles that were still attached and still functioning, and at the conclusion of that we do what we call functional capacity testing where we did actual job simulation for Mr. Huberty. And in very short order, again the same motion that in my opinion caused the injury, when those motions were repeated they were poorly tolerated, and in doing just a short amount of that he had a marked increase in what we call crepitus or grinding, within the shoulder joint and a marked increase in his pain.
* * *
 Q. Doctor, if you could please describe to the jury with this medical condition, what Ed's limitations or restrictions were with respect to performing manual tasks or working, I would appreciate it.
 A. As I counseled Mr. Huberty, the rotator cuff muscles come into greatest play as the arms are raised above about the breast line level. So any activities that require the arms to be postured from here above (indicating) would be very troublesome for Mr. Huberty. I told him that for the rest of his life he would have to restrict any type of repetitive activity overhead and certainly should not attempt to take anything of weight above that level. I told him it was in his best interests to find tasks that could be done below that level.
 Q. Doctor, did these restrictions on Mr. Huberty impose restrictions on him which were significantly different than those of that, say, someone in the general public would have?
* * *
 A. Yes, they did. Those in the general population are able to perform the activities as I've outlined them, namely lifting the arms overhead with strength and the ability to do tasks in that area of function.
Q. And would you describe these as significant restrictions?
* * *
A. Yes. * * *
Deposition of Dr. Pentz at 20-25.
We find the testimony of Dr. Pentz was sufficient, at the very least, for plaintiff to meet her reciprocal burden under the summary judgment standard on the issue of whether Mr. Huberty was disabled under the ADA. Specifically, Dr. Pentz's testimony indicated appellant had substantial limitations on the major life activities of either performing a manual task and/or working. Although the questioning never specifically focused on the issue, reasonable minds could find appellant also had a substantial limitation on the major life activities of lifting and reaching. We find a genuine dispute exists as to whether appellant was disabled under the ADA. Handicap Discrimination under R.C. 4112.02
The trial court also specifically found appellant was not handicapped under R.C. 4112.02. This statute provides, in pertinent part: It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * handicap* * * of any person, to discharge without just cause * * * or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment.
Handicap is defined as:
 A physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working * * *
R.C. 4112.01(A)(13).
Because the statute is so similar to the ADA definition and because we found appellant met her rebuttal burden by specifically pointing to record evidence Mr. Huberty was substantially limited in the major life activity of performing manual tasks, we find a genuine dispute exists as to whether Mr. Huberty was "handicapped" pursuant to R.C. 4112.02(A). Appellant's first assignment of error is sustained.
 II
In her second assignment of error, appellant maintains the trial court erred in finding Mr. Huberty was not entitled to a reasonable accommodation by his employer. As set forth above, appellant would only be entitled to a reasonable accommodation if he were a "qualified individual with a disability." Of course, we must first analyze whether appellant was a qualified individual with a disability. This concept is defined in 29 C.F.R. 1630.2(m): (m) Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.
(Emphasis added).
The appendix to the section further explains: The ADA prohibits discrimination on the basis of disability against qualified individuals with disabilities. The determination of whether an individual with a disability is "qualified" should be made in two steps. The first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment, experience, skills, licenses, etc. For example, the first step in determining whether an accountant who is paraplegic is qualified for a certified public accountant (CPA) position is to examine the individual's credentials to determine whether the individual is a licenced CPA. This is sometimes referred to in the Rehabilitation Act caselaw as determining whether the individual is "otherwise qualified" for the position. * * * The second step is to determine whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation. The purpose of this second step is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because thy are not able to perform marginal functions of the position. 29 C.F.R. 1630.2(m) app.
In its judgment entry, the trial court found: Plaintiff further argues that under the ADA, the defendant was obligated to provide a reasonable accommodation. However, as [Mr. Huberty] was not disabled under the ADA or the applicable Ohio statutes, no duty was incumbent on the employer to place him in a different position. * * *
The Court finds that nowhere in the ADA does it state that an employer must find another or a different job for an employee who can no longer perform his previous job duties. Judgment Entry at p. 4
We agree the ADA does not "require" an employer to locate a different job for a qualified person with a disability, but it does require an analysis of whether a disabled individual can perform a job he or she desires. Reasonable accommodation may be made after a reassignment has taken place, or may be the reassignment itself. The concept is defined as:
 (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
 (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; * * *
(2) Reasonable accommodation may include but is not limited to:
 (i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
 (ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.
 (3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.
(Emphasis added). 29 C.F.R. 1630.2 (o).
In light of our finding in appellant's first assignment of error, we also sustain appellant's second assignment of error. The trial court stopped its analysis with a finding appellant's decedent was not "disabled." However, in light of our disposition of appellant's first assignment of error, it is now necessary for the trial court to analyze whether there exists a genuine dispute as to whether appellant was a qualified individual with a disability, i.e., entitled to the position he held or desired, with or without reasonable accommodation. Finally, we note the federal statutory scheme also provides defenses and exceptions to an employer's duty to a qualified individual with a disability. Those exceptions may apply in this case, but the trial court never conducted the analysis. Accordingly, we remand this issue to the trial court for further examination in light of our finding a genuine dispute exists as to whether appellant was disabled pursuant to29 C.F.R. 1630.2 and 29 C.F.R. 1630 app.
 III
In appellant's third assignment of error, she maintains the trial court erred in finding her public policy claim was preempted by the National Labor Relations Act and R.C. 4123.90. On appeal, appellant maintains Mr. Huberty's right to the BSR position did not arise from the collective bargaining agreement. Rather, any wrongful discharge arose from appellees' failure to provide a reasonable accommodation by assigning Mr. Huberty to the BSR position pursuant to the ADA. Appellant maintains because the BSR position was not covered under the collective bargaining agreement, and was actually an at-will position, appellees' discriminatory actions of not assigning him to the position amounted to a constructive discharge. Appellant asserts the public policy basis for her wrongful discharge claim was the ADA violation. In its October 29, 1999 Judgment Entry, the trial court found appellant's public policy claim for wrongful discharge applies only to at-will employees and, because Mr. Huberty was not an at-will employee, the claim failed as a matter of law. Because the terms and conditions of Mr. Huberty's employment were governed by a collective bargaining agreement, the trial court reasoned the public policy exception to the employment-at-will doctrine did not apply to him. We find any determination relative to appellant's third assignment of error to be premature. If the trier of fact determines Mr. Huberty was disabled; Mr. Huberty was a qualified individual with a disability; appellees failed to place Mr. Huberty in a position he had or desired (the BSR position); and no employer exceptions or defenses applied; we find such would be the functional equivalent of a constructive discharge from the BSR position. Because the BSR position is not covered under the collective bargaining agreement appellant's public policy claim for wrongful discharge in violation of the ADA would not then be preempted.
 IV
Finally, appellant maintains the trial court erred in dismissing his claim for intentional infliction of emotional distress. In Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, the Ohio Supreme Court held that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress." Id. at syllabus paragraph one. With respect to the requirement that the conduct alleged be extreme and outrageous, the Court explained: It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
Id. at 374-5.
In their motion for summary judgment, appellees conceded the deposition testimony showed Gary Esber to be a demanding and somewhat abrasive manager. However, appellee's assert the evidence stopped short of demonstrating any conduct "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency." We agree. In their motion for summary judgment, appellees pointed to the deposition testimony of Joseph Orwick, another driver/salesman for Esber Beverage. Mr. Orwick testified Gary Esber yelled and directed foul language at employees. In response, appellant pointed to an audiotape of a conversation between Mr. Huberty and Steve Graham. In this conversation, Mr. Graham explained to Mr. Huberty that Gary Esber hated Mr. Huberty. We find appellant was unable to meet the her burden on summary judgment to demonstrate any conduct on the part of Mr. Esber was so outrageous as to amount to intentional infliction of emotional distress. We further find appellant was unable to demonstrate Mr. Esber's anti-union animus and the fact appellees contested Mr. Huberty's workers' compensation claim are insufficient to support a finding of outrageous conduct beyond the bounds of decency. For this reason, appellant's fourth assignment of error is overruled. The October 29, 1999 Judgment Entry of the Stark County Court of Common Pleas is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with law and this opinion.
 __________________ Hoffman, P.J.
By: Hoffman, P.J. Edwards, J. and Reader, V.J. concur.